UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 15-10029 |
| DEMONTAE BELL, | ) |
| Defendant. | ) |

# ORDER AND OPINION

This matter is now before the Court on Defendant Demontae Bell's Amended Motion [53] to Suppress. For the reasons set forth below, Defendant's Motion is DENIED.

**Background**

On November 6, 2014, the Pekin Police Department responded to a report of a burglary where a Glock pistol, two AR-15 style rifles, and an AK-47 style rifle were stolen from a residential building in Pekin, Illinois. The resident reported a name to the police who he believed stole the firearms. The police interviewed that person, "C/S-1," who had been arrested on charges related to the manufacture of methamphetamine. C/S-1 admitted to stealing the firearms, and told the police that he sold them in Peoria to a drug dealer known as "Jay" for money and cocaine.

After the interview, the informant began working with the FBI and Illinois State Police as part of a proffer agreement in order to recover the firearms. The agents and C/S-1 arranged a controlled purchase of a small amount of cocaine from "Jay," where video and photographs were taken of the suspect. Later, an FBI agent interviewed an inmate at Peoria County Jail. After the agent showed the inmate portions of the video and photos taken during the controlled buy, the inmate recognized Defendant as Demontae Bell. The agent accessed the Peoria County Jail's

1

online record system after the interview and printed a photo of Bell without any identifiers. When the agent showed the photo to C/S-1, the informant identified the individual in the photo as Demontae Bell. On February 23, 2015, the FBI agent searched Bell's criminal history and found a prior felony conviction for delivery of controlled substances.

On February 25, 2015, the FBI and State Police conducted a second controlled buy of cocaine from Bell, again recording audio and video of the transaction. Bell entered C/S-1's vehicle and conversed with the informant about attempts to locate magazines for the stolen AK-47 rifle, and Bell informed C/S-1 that he sold the weapon. Bell told C/S-1 that he had a photo of the AK-47 on his phone, which he sent to C/S-1 via picture message and the FBI agent later viewed.

Bell was arrested on April 9, 2015, for possession of the stolen AK-47 and charged with being a felon in possession of a firearm, in violation of Title 18 United States Code, Section 922(g). Upon Bell's arrest, a black mobile flip phone was located on his person. After Bell was arrested, he was transported to the Peoria Police Department and placed in an interview room. Shortly thereafter, Officer Sinks arrived at the police station (he was not the arresting officer). At the suppression hearing Sinks testified that before interviewing Bell with agent Nixon, he opened the door to the interview room, grabbed Bell's cell phone from a bag or container outside the door, opened the phone (purportedly to turn it off) and showed the home screen depicting the rifle to Bell with an inquisitive look. Officer Sinks then held the power button on the phone to turn it off. Once SA Nixon arrived, Sinks told him what he saw on the phone. In the interview room, Officer Sinks and SA Nixon again opened the phone, which was now turned off, and then removed the battery and recorded the serial numbers on the device.

On April 17, 2015, the United States submitted an application for a search warrant based on the affidavit of Special Agent Jason Nixon, and Judge McDade granted the warrant the same day. A subsequent search warrant for electronically stored data relating to the date and time the picture was taken was granted on October 20, 2015.

## Legal Standard

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). Thus, "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One exception to the warrant requirement is for a search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752 (1969).

Although a search incident to lawful arrest remains an exception to the warrant requirement, the Supreme Court has declined to extend the categorical rule for searches incident to arrest to searches of data on cell phones. *Riley v. California*, 134 S.Ct. 2473, 2485 (2014) (holding that officers must generally secure a warrant before conducting a search of data on cell phones, even when a cell phone is seized incident to arrest). Part of the Supreme Court's rationale for treating cell phones differently stemmed from the fact that "[c]ell phones differ in both a quantitative and qualitative sense from other objects that might be kept on an arrestee's person." *Riley*, 134 S.Ct. at 2489. In holding that the search incident to arrest exception to the warrant requirement does not extend to cell phones, the Supreme Court noted that "other case-

3

specific exceptions may still justify a warrantless search of a particular phone," such as the exigent circumstances exception. *Id.* at 2494.

The *Riley* decision also addressed the government's concerns about officer safety and the potential loss or destruction of evidence in particular cases. *Id*. at 2485-89. As to the first concern, the Court made clear that law enforcement officers "remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon—say, to determine whether there is a razor blade hidden between the phone and its case." *Id*. at 2485. As to the latter concern, preventing the destruction of evidence, the Court reasoned that "law enforcement is not without specific means to address the threat." *Id*. at 2487. For instance, the Court stated that remote wiping could be prevented by disconnecting the phone from the network, either by turning the phone off, removing its battery, or placing it in a Faraday bag. *Id*. (also noting, in the event that officers seize a phone in an unlocked state, that they may be able to disable the phone's locking mechanism as a preventative measure under *McArthur*, which approved of officers' reasonable steps to secure a scene and preserve evidence while they awaited a warrant).

**Analysis**

Defendant Bell's Motion argues that Officer Sinks conducted an unconstitutional search when he opened Bell's phone. The government's response contends that Officer Sinks' conduct did not amount to a search because the photograph of the firearm was in plain view, and "*Riley* specifically approved of this procedure and authorize[d] the officer to do exactly what he did."

**1) Whether Opening Bell's Phone Constituted a Search**

The government's response to Bell's Motion asserts that Officer Sinks' opening of the flip phone did not constitute a search. While it is true that a "cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for

Fourth Amendment purposes," Officer Sinks' opening of Bell's cell phone exceeded a "cursory inspection" because he exposed to view concealed portions of the object—i.e., the screen. See *Arizona v. Hicks*, 480 U.S. 321, 328-29 (1987). The Supreme Court specifically addressed this issue in *Hicks*, noting that the "distinction between 'looking' at a suspicious object in plain view and 'moving' it even a few inches is much more than trivial for purposes of the Fourth Amendment." *Id*. at 325. Officer Sinks' opening of the flip phone, like the officer moving the stereo equipment in *Hicks*, "exposed to view concealed portions of the [object]" and thus "produced a new invasion of [defendant's] privacy." See *Hicks*, 480 U.S. at 324 (reasoning that "[a] search is a search, even if it happens to disclose nothing but the bottom of a turntable").

Likewise, because Officer Sinks had to manipulate the phone to view the picture on the screen, that picture was by definition not in "plain view." See *Hicks*, 480 U.S. at 326; see also *United States v. Venegas*, 594 Fed. App'x. 822, 825 (5th Cir. 2014) ("Because Deputy Villegas had to manipulate the phone to view the photograph, however, we are hesitant to conclude that the photograph was within Deputy Villegas's plain view."). The government's assertion that "the defendant's cell phone was lawfully seized" also misses the point. Although the police officers were justified in searching his person and seizing his personal effects upon his arrest, *Riley* made clear that "while *Robinson's* categorical rule [for searches incident to arrest] strikes the appropriate balance in the context of physical objects," "a warrant is generally required before [a cell phone] search, even when a cell phone is seized incident to arrest." *Riley*, 134 S.Ct. at 2484, 2493.

Here, Officer Sinks' search of Bell's cell phone was limited to viewing the home screen. He did not rummage through videos, photos, contacts and call logs like the officers who searched Riley's cell phone. *Riley*, 134 S.Ct. at 2480-81. The search of Bell's cell phone was also less

5

intrusive than the search of Wurie's flip phone. *Id*. at 2481 (in the companion case to *Riley*, the officers opened Wurie's phone after it repeatedly rang, observed the home screen picture of a woman and a baby, opened the call log, and found the number associated with the incoming calls). It is also possible that Bell has a lesser privacy interest in the information contained on the home screen of his cell phone than he does on information stored elsewhere on the device. For example, in *United States v. Concepcion*, the Seventh Circuit held that although Concepcion had a privacy interest in the keyhole of an apartment door lock sufficient to make the inspection of the lock a "search," "the privacy interest [was] so small that the officers [did] not need probable cause to inspect it." 942 F.2d 1170, 1173 (7th Cir. 1991). *Concepcion* distinguished the lock from the turntable in *Hicks*, reasoning that "[w]hat the officers learned from inverting the turntable in *Hicks* they could not have come by in any other way; these agents thus invaded less of Concepcion's interest in security of information when they used the key to verify his address." *Id*.

However, *Concepcion* is distinguishable from *Riley* because searches of information stored on cell phones implicate privacy interests that necessitate stronger protections against warrantless searches compared to the physical objects envisioned in *Robinson*. See *Riley*, 134 S.Ct. at 2478 (noting that searches of an arrestee's pockets "works no substantial additional intrusion on privacy beyond the arrest itself," for physical items, but "more substantial privacy interests are at stake when digital data is involved"). The lens through which all information on a cell phone is observed is the screen. On both flip phones and more modern, advanced devices, "notifications" are regularly displayed on the home screen or lock screen indicating text messages, missed calls, and other alerts. The position that the government advances here—that officers can always open a phone and look at the screen to turn the phone off without conducting

6

a "search" at all—is inconsistent with *Riley's* requirement that "unlike the search incident to arrest exception, the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case." *Id*. at 2494. Just as *Riley* analyzed and rejected California's attempt to create across the board exceptions, such as a rule allowing police to search call logs, without a warrant, the Court sees no reason to allow law enforcement to circumvent the warrant requirement in every case under the guise that they discovered evidence when they opened the phone or turned on the screen to turn the phone off.

Furthermore, "[a] series of opinions allowing some cell phone searches but not others, based on the nature and reasonableness of the intrusion, would create exactly the 'inherently subjective and highly fact specific' set of rules that the Court has warned against and would be extremely difficult for officers in the field to apply." *United States v. Wurie*, 728 F.3d 1, 12-13 (1st Cir. 2013) *aff'd sub nom. Riley v. California*, 134 S.Ct 2473 (2014). The prescient *Wurie* opinion warned of the justification offered by the government here, noting that "[a] rule based on particular instances in which the police do not take full advantage of the unlimited potential presented by cell phone data searches would prove impotent in those cases in which they choose to exploit that potential." Having determined that a search occured, whether Officer Sinks' warrantless search of Bell's cell phone was permissible depends on whether an exception to the general rule justified the warrantless search.

**2) Whether the Warrantless Search was Reasonable: Exigent Circumstances**

"In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 134 S.Ct. at 2482, quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011). One such exception is for exigent circumstances, where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is

7

objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 459. Here, two such exigencies are relevant: harm to officers and destruction of evidence. See *Chimel v. California*, 395 U.S. 752 (1969).

### a) Officer Safety

> Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape. Law enforcement officers remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon—say, to determine whether there is a razor blade hidden between the phone and its case. Once an officer has secured a phone and eliminated any potential physical threats, however, data on the phone can endanger no one.

*Riley v. California*, 134 S. Ct. 2473, 2485 (2014).

The Court in *Riley* acknowledged the possibility that a cell phone could conceal weapons such as a razor blade, but reasoned that such possibility does not "justify dispensing with the warrant requirement across the board." *Id*. at 2486. Rather, "[t]o the extent dangers to arresting officers may be implicated in a particular way in a particular case, they are better addressed through consideration of case-specific exceptions to the warrant requirement, such as the one for exigent circumstances." *Id*. The government's response to Defendant's Motion largely parrots the exigent circumstances hypotheticals offered by the Court in *Riley*. See E.C.F. Doc 60, at 8 ("Phones may also have been physically altered in a way that poses a risk to officer safety . . . [a]lthough the Court in *Riley* did not consider these risks to be sufficient to justify routine warrantless searches of a phone's contents, it approved of law enforcement taking reasonable steps to protect themselves and preserve data while a warrant is sought."). The problem with the government's argument is that it does not claim that the officer searched the phone because he was actually concerned for his safety. And because the search of Bell's phone occurred while Bell was in custody at the police station, such a concern would either be remote or entirely

8

absent. Since *Riley* recognized case-specific exceptions to the warrant requirement when "dangers to arresting officers may be implicated in a particular way in a particular case," it follows that the concern for officer safety must actually be present in the particular case in order for the exception to apply. *Riley*, 134. S.Ct. at 2486. No such facts are present here; thus, officer safety does not justify the search.

### *b) Preventing Destruction of Evidence*

Exigent circumstances may also justify law enforcement efforts to prevent the destruction of evidence when officers have specific concerns about the potential loss of evidence in a particular case. *Id*. at 2487; *Chimel v. California*, 395 U.S. 752, 764 (1969). As the Court in *Riley* acknowledged, information stored on cell phones may be vulnerable to remote wiping, where the cell phone's owner or a third party can send a wireless signal that erases the data stored on the device. *Riley*, 134 S.Ct. at 2486-87 (the Court noted, however, that it has "little reason to believe" that remote wiping is prevalent). The *Riley* Opinion offered a number of solutions to address situations where law enforcement officers suspect that someone may attempt to erase the information stored on a seized device:

> In any event, as to remote wiping, law enforcement is not without specific means to address the threat. Remote wiping can be fully prevented by disconnecting a phone from the network. There are at least two simple ways to do this: First, law enforcement officers can turn the phone off or remove its battery. Second, if they are concerned about encryption or other potential problems, they can leave a phone powered on and place it in an enclosure that isolates the phone from radio waves. . . .

> To the extent that law enforcement still has specific concerns about the potential loss of evidence in a particular case, there remain more targeted ways to address those concerns. If "the police are truly confronted with a 'now or never' situation,"—for example, circumstances suggesting that a defendant's phone will be the target of an imminent remote-wipe attempt—they may be able to rely on exigent circumstances to search the phone immediately. *Missouri v. McNeely*,133 S.Ct. 1552, 1561–1562 (2013). Or, if officers happen to seize a phone in an unlocked state, they may be able to disable a phone's automatic-lock feature in

>order to prevent the phone from locking and encrypting data. Such a preventive measure could be analyzed under the principles set forth in our decision in *McArthur,* 531 U.S. 326, which approved officers' reasonable steps to secure a scene to preserve evidence while they awaited a warrant.

*Riley v. California*, 134 S. Ct. 2473, 2487-88 (2014) (some citations omitted).

Again, the problem with the government's argument is that it does not claim the arresting officer searched the phone because he was actually concerned that data on Bell's cell phone risked destruction by remote wiping. Although *Riley* did not offer specific guidance as to how courts should scrutinize law enforcement's claims alleging concern for officer safety or destruction of evidence, the *Riley* Opinion was clear that exigent circumstances must actually be present "in each particular case" in order for the exception to the warrant requirement to apply. *Id.* at 2494 ("The critical point is that, unlike the search incident to arrest exception, the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search *in each particular case.*")(emphasis added).

The government's response appears to concede as much, stating that "the Court in *Riley* did not consider these risks to be sufficient to justify routine warrantless searches of a phone's contents," but goes on to state that the Court "approved of law enforcement officers taking reasonable steps to protect themselves and to preserve data while a warrant is sought." Yet neither the government's response, nor the warrant affidavit, asserted that the officer in this case opened Bell's cell phone out of a concern for officer safety or preservation of evidence. And without that nexus, the officer's search of Bell's cell phone amounted to the very "routine warrantless search" that the government's response acknowledges *Riley* proscribed.

Lastly, the statement in the government's response that Officer Sinks opened the phone "following his training and standard procedure" is inconsistent with testimony elicited from Sinks and other officers at the suppression hearing. See E.C.F. Doc. 60, at 5. At the hearing,

Sinks testified that department procedures instructed officers to remove the battery once a phone is seized, but stated that no one had briefed him on Bell's status and he did not believe Bell's phone had been "seized" at that point. Although the Court believes the facts indicate the phone was seized—Bell was arrested pursuant to an arrest warrant, he was in custody at the Peoria Police Department and his phone was taken from his person—Officer Sinks' belief regarding when the phone was seized does not change the analysis. Officer Sinks also testified that he typically powers a phone off to avoid any distractions, and if Bell were to be released the phone would be returned to him. Agent Nixon testified that he wanted to seize the phone but had not yet informed Sinks of his intention to do so. Officer Feehan testified that the policy was put in place partly because snooping software could be used to listen in on conversations when the phone is turned off but still connected to the battery, and other methods could "compromise data" on the phone. While the procedure may be outdated as applied to modern cell phones that lack removable batteries, that problem was not present here, and the video later showed Officer Sinks removing the battery. Where officers have two equally effective options to turn off a phone, they should choose the less intrusive option. That was not done in this case, and as a result, incriminating evidence was found.

      In sum, the testimony surrounding the department policies and procedures for handling Bell's cell phone further supports the Court's conclusion that the search was unlawful. The government has not demonstrated the presence of exigent circumstances in this particular case; thus, *Riley's* general rule prohibiting warrantless searches of cell phones applies. The search of Bell's cell phone violated the Fourth Amendment prohibition against unreasonable searches and seizures.

**3) The April and October 2015 Search Warrants**

The Defendant also moves to suppress any evidence obtained from the April and October search warrants on the grounds that the warrants were not supported by probable cause. Specifically, Defendant argues that: (1) the affidavit submitted in support of the warrant application relied on a confidential source who did not testify before the issuing judge and whose reliability was not established; (2) the recording and transcripts were not provided to the issuing judge; (3) the affidavit does not state whether the confidential source or the theft victim confirmed that the firearm depicted in the photograph was the same firearm that was stolen and later sold to the Defendant; and (4) the affidavit does not state the telephone number associated with the February 25, 2015 picture message was the same number as the one assigned to the cell phone seized from Defendant. The application for warrant contains a paragraph reciting Officer Sinks' observation of the picture on the home screen of Bell's cell phone. See E.C.F. Doc 53, Ex. 3, at 3.

The government's response argues that: (1) the officer did not run afoul of the Fourth Amendment when he opened Bell's cell phone before obtaining a warrant; thus, the paragraph in the warrant application should not be stricken; and (2) even if the paragraph was stricken, the affidavit sufficed to establish probable cause to grant the warrant. As discussed above, the officer's opening of Bell's cell phone constituted a search in violation of the Fourth Amendment. Thus, the Court cabins its analysis to the government's alternative argument—whether the warrants were supported by probable cause absent the offending paragraph.

The following statements are taken from the April, 2015 affidavit in support of warrant. An AK-47 style rifle was stolen from a Pekin resident's home, and that the resident suspected C/S-1 was responsible for the burglary. C/S-1 confessed to the burglary as part of a proffer

agreement after C/S-1 had been arrested on charges related to the manufacture of methamphetamine. The confidential source advised law enforcement that he sold the firearms to a drug dealer by the street name "Jay" for cocaine and money. C/S-1 provided assistance to the FBI and Illinois State Police, including participating in a controlled buy of small amounts of cocaine from "Jay" where both video and photographs were taken. On February 17, 2015, SA Nixon interviewed an inmate at the Peoria County Jail. The inmate was shown portions of the video and a photograph from the controlled buy and immediately recognized the individual as Demontae Bell, stating his confidence was a "ten" on a one-to-ten scale.

After the interview, SA Nixon showed an unmarked booking picture of Demontae Bell to C/S-1, who positively identified the individual as "Jay." SA Nixon ran a query of Bell's criminal history and observed that bell was arrested in 2002 for charges relating to delivery of a controlled substance and the felony sentence disposition stated "3 years." On February 25, 2015, a second controlled buy with C/S-1 and Bell was conducted using a concealed audio/video recording device. During the purchase, Bell entered C/S-1's vehicle and discussed C/S-1's attempts to locate magazines for the stolen AK-47. The recording confirmed that Bell told C/S-1 that he had sold the AK-47. The video recording also depicted Bell informing C/S-1 that he had a picture of the AK-47 on his phone and sending that picture to C/S-1 from his cell phone, which SA Nixon later viewed.[1]

An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause. *Illinois v. Gates*, 462 U.S. 213, 239 (1983). When an affidavit is the only evidence presented to a judge in support of a search warrant, the warrant's validity rests solely on the strength of the affidavit. *United States v. Peck*, 317 F.3d 754, 756 (2003). When analyzing the

---

[1] At the hearing, Bell's attorney stated that additional information was omitted from the affidavit that would have negated the existence of probable cause necessary to secure a warrant. That evidence is not before the Court at this time and was not considered.

credibility of an informant, a court considers: (1) the personal observations of the informant, (2) the degree of detail given in the affidavit, (3) independent police corroboration of the information, (4) the interval of time between the events and the application for a warrant, and (5) whether the informant testified at the probable cause hearing. *Id*. A deficiency in one factor may be compensated by strength in another or some other indication of reliability. *Id*. A facially valid warrant issued by a neutral, detached magistrate will be upheld if the police relied on the warrant in good faith. See *United States v. Leon*, 468 U.S. 897, 915 (1984).

Here, the issuing judge had a substantial basis for determining the existence of probable cause, and omitting the offending paragraph about the officer opening the phone does not alter that conclusion. Defendant argues that the affidavit in support of the warrant relied on a confidential source who did not testify in front of the issuing judge, and who cooperated with law enforcement as part of a proffer agreement for drug charges. True, but the veracity of an informant is only one factor among many that Courts consider when making a probable cause determination. See *Gates*, 462 U.S. at 238. And while veracity, reliability, and basis of knowledge are highly relevant, those considerations should not "be understood as entirely separate and independent requirements to be rigidly drawn in every case." *Id.* at 230. Moreover, "[t]he reliability or veracity of an informant in a particular case can also be shown by corroboration of the information he provides through independent police investigation." *United States v. Mitten*, 592 F.3d 767, 774 (7th Cir. 2010). The fact that the confidential source was "motivated by a desire to lessen the consequences [he] would likely suffer for [his] own crimes . . . does not make the information [he] provide[d] inherently unreliable." *Id*. (quoting *United States v. Olson*, 408 F.3d 366, 371 (7th Cir. 2005)).

Here, the confidential source was implicated by the victim of the firearm burglary, who the victim believed had knowledge of his gun collection and sold guns. When law enforcement

14

interviewed C/S-1, he admitted he sold the guns to a Peoria drug dealer with the alias "Jay." A separate informant confirmed that "Jay" was Demontae Bell. A search of Bell's criminal history revealed that he had a prior felony conviction for delivery of a controlled substance. The two controlled purchases between Bell and C/S-1 were recorded. The affidavit summarizes (accurately) the conversations between Bell and C/S-1, including admissions by Bell that he sold the AK-47. Significantly, the affidavit states, and the transcript supports, the fact that Bell used his cell phone to send C/S-1 a picture of the firearm, and that SA Nixon viewed the picture on C/S-1's phone shortly after it was sent.

From these facts, the affidavit submitted in support of the warrant application provided detailed, collaborated information from which the issuing judge reasonably concluded there was a fair probability that contraband or evidence of a crime would be found on Defendant's cell phone. *Gates*, 462 U.S. at 238. Omitting the reference to the officer opening the phone does not alter the probable cause determination. Moreover, the picture of the AK-47 on Bell's cell phone was not discovered inadvertently through the warrantless search. Rather, it was the same picture Bell sent to C/S-1 and SA Nixon viewed. Because the officers knew that Bell had a picture of the gun on his phone before the search ever took place, the independent source doctrine applies. See *Nix v. Williams*, 467 U.S. 431, 443 (1984). Under the independent source doctrine, the police are put "in the same, not a worse, position than they would have been if no police error or misconduct had occurred." *Id*. Here, if Officer Sinks had not opened Bell's phone, the photo would have ultimately been discovered because the officers knew that Bell had the photo on his phone.

Lastly, the second search warrant was almost identical to the first, except that it replaced the offending paragraph about Officer Sinks opening the phone with a statement that the picture

was found when the first warrant was executed. Therefore, the search warrants were adequately supported by probable cause and the photo and associated data will not be suppressed.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress is DENIED. This matter remains set for pretrial conference on May 5, 2016.

Signed on this 20th day of April, 2016.

s/ James E. Shadid<br>
James E. Shadid<br>
United States District Judge