UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 15-10029 |
| DEMONTAE BELL, | ) |
| Defendant. | ) |

# ORDER AND OPINION

This matter is now before the Court on Defendant Bell's Motion [68] to Quash Arrest Warrant and to Suppress Evidence and Motion [72] for *Franks* Hearing. For the reasons set forth below, Defendant's Motion [68] to Quash and Motion [72] for *Franks* Hearing are DENIED.

## BACKGROUND

On November 6, 2014, the Pekin Police Department responded to a report of a burglary where a Glock pistol, two AR-15 style rifles, an air rifle, and an AK-47 style rifle were stolen from a residential building in Pekin, Illinois. The resident reported a name to the police who he believed stole the firearms. The police interviewed that person, ("C/S-1" or "Turner") who had been arrested on charges related to the manufacture of methamphetamine. C/S-1 admitted to stealing the firearms, and told the police that he sold them in Peoria to a drug dealer known as "Jay" for money and cocaine.

After the interview, the informant began working with the FBI and Illinois State Police as part of a proffer agreement in order to recover the firearms. The agents and C/S-1 arranged a controlled purchase of a small amount of cocaine from "Jay," where video and photographs were taken of the suspect. Later, an FBI agent interviewed an inmate at Peoria County Jail. After the

1

agent showed the inmate photos taken during the controlled buy, the inmate recognized Defendant as Demontae Bell, or "Tay Tay." The agent accessed the Peoria County Jail's online record system after the interview and printed a photo of Bell without any identifiers. When the agent showed the photo to C/S-1, the informant confirmed that the individual in the photo was "Jay." On February 23, 2015, the FBI agent searched Bell's criminal history and found a prior felony conviction for delivery of controlled substances.

On February 25, 2015, the FBI and State Police conducted a second controlled buy of cocaine from Bell, again recording audio and video of the transaction. Bell entered C/S-1's vehicle and conversed with the informant about attempts to locate magazines for the stolen AK-47 rifle, and Bell informed C/S-1 that he sold the weapon. Bell told C/S-1 that he had a photo of the AK-47 on his phone, which he sent to C/S-1 via picture message and the FBI agent later viewed. A warrant for Bell's arrest was issued on April 8, 2015. Bell was arrested the next day for possession of the stolen AK-47 and charged with being a felon in possession of a firearm in violation of Title 18 United States Code, Section 922(g).

A black mobile flip phone was found on Bell's person upon his arrest. Bell was then transported to the Peoria Police Department and placed in an interview room. Before Bell was given a *Miranda* warning, Officer Sinks entered the room after picking up Bell's cell phone from a container outside of the door. Sinks opened the flip phone in front of Bell and showed him the home screen depicting the rifle with an inquisitive look. In response to Officer Sinks' gesture, Bell allegedly made a statement indicating he downloaded the picture of the firearm from the internet.

Bell previously moved to suppress the picture, arguing that it was obtained as the result of an unconstitutional warrantless search, and that the two subsequent cell phone search warrants

(issued on April 17 and October 20, respectively) were not supported by probable cause. Specifically, Defendant argued that: (1) the affidavit submitted in support of the warrant application relied on a confidential source who did not testify before the issuing judge and whose reliability was not established; (2) the recording and transcripts were not provided to the issuing judge; (3) the affidavit did not state whether the confidential source or the theft victim confirmed that the firearm depicted in the photograph was the same firearm that was stolen and later sold to the Defendant; and (4) the affidavit did not state the telephone number associated with the February 25, 2015 picture message was the same number as the one assigned to the cell phone seized from Defendant. The first application for warrant contained a paragraph reciting Officer Sinks' observation of the picture on the home screen of Bell's cell phone.

On April 20, 2016, the Court issued an Opinion finding that Officer Sinks conducted an unconstitutional search of Bell's cell phone. However, the Court denied the motion to suppress the picture because (1) both of the subsequent search warrants provided detailed, collaborated information from which the issuing judge reasonably concluded there was a fair probability that contraband or evidence of a crime would be found on Defendant's cell phone, *Gates*, 462 U.S. at 238; (2) omitting the first search warrant affidavit's reference to the officer opening the phone did not alter the probable cause determination; and (3) the picture of the AK-47 on Bell's cell phone was not discovered inadvertently through the warrantless search because the officers knew that Bell had a picture of the gun on his phone before the search ever took place. Thus, the Court found that the picture should not be suppressed because it would have been discovered despite Officer Sinks' search.

Defendant now brings a *Franks* motion challenging the veracity of affidavits in support of the arrest and search warrants, and a motion to quash the arrest warrant. On October 20, 2016,

the Court held a "pre-*Franks*" hearing where Defendant was allowed to develop his arguments and the Government was limited to arguing that Defendant has not met the requirements for a *Franks* hearing based on the information contained in the affidavits.

## LEGAL STANDARD

In order to obtain a *Franks* hearing, a defendant must first make a substantial preliminary showing that a false statement was knowingly or intentionally, or with reckless disregard for the truth, included by the affiant in the warrant affidavit. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Next, the defendant must show that the alleged false statement was essential to the establishment of probable cause. *Id*. If the warrant affidavit, stripped of the allegedly false information, still suffices to establish probable cause, no hearing is required. *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003).

If a defendant makes such a showing, the Fourth Amendment entitles him to an evidentiary hearing to challenge the constitutionality of the search. *United States v. Spears*, 673 F.3d 598, 604 (7th Cir. 2012). At a *Franks* hearing, the court first determines whether the defendant has shown by a preponderance of the evidence that false information was intentionally or recklessly included in the affidavit. If the defendant makes such a showing, the court then determines whether the affidavit, stripped of the false information, is nevertheless sufficient to establish probable cause. *Id*.

The defendant is not limited to challenging affirmative statements appearing in the warrant affidavit; omissions from the affidavit may also be challenged. *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990) overruled on other grounds, *United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001); *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984). The defendant bears a substantial burden with respect to such omissions. He must offer direct

evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting the facts disregarded. *Souffront*, 338 F.3d at 822. The mere fact that the affidavit omitted information about the informant's criminal background or a motive to provide information against the defendant will not destroy the probable cause determination where the remainder of the affidavit establishes reliability. *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006).

District Courts may hold a "pre-*Franks*" hearing to determine whether the preliminary showing can be met. Such preliminary hearings can aid the court's determination by giving defendants an opportunity to develop their arguments or elaborate on their original submissions. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). However, courts should not consider "the government's explanation of the contradictions and discrepancies" at the pre-*Franks* hearing. *Id*. Rather, a court should "limit[] its consideration of new information to the defense's evidence tending to refute probable cause." *Id*.

## ANALYSIS

### A. DEFENDANT'S MOTION FOR FRANKS HEARING

*1. The Nixon Affidavit*

On April 8, 2015, FBI Special Agent Nixon presented an affidavit in support of an arrest warrant for Demontae Bell to Magistrate Judge Hawley. Under the heading of "probable cause," the affidavit included the following paragraphs:

> 3. On November 6, 2014, the Pekin Police Department responded to a burglary at the residence of Joel Weakley, 1915 Windsor Street, Pekin, Illinois. Among the items stolen were included one Glock pistol, two AR-15 style rifles, one Polish AK-47 style rifle, and one air rifle with a scope. Upon being interviewed by Pekin Police officers, Weakley advised a probable suspect for the burglary was a co-worker named [NAME REDACTED - hereinafter referred to as C/S-1], who Weakley believed had knowledge of his gun collection and was "into selling guns."

5

4. On January 7, 2015, Pekin Police officers interviewed C/S-1 in the presences of his/her attorney and pursuant to a proffer agreement after C/S-1 had been arrested on charges related to manufacture of Methamphetamine. During the interview, C/S-1 confessed to committing the above burglary. Further, C/S-1 advised after taking possession of the firearms, C/S-1 transported them to Peoria, Illinois and sold them to a drug dealer by the street name "Jay" for money and cocaine.

5. Subsequent to the above events, C/S-1 began providing assistance to the FBI as a Confidential Human Source involving the investigation into the whereabouts of the stolen firearms in cooperation with Illinois State Police's Peoria Multi County Narcotics Enforcement Group (PMEG). On February 13, 2015, FBI and PMEG conducted a controlled purchase of a small amount of cocaine from Jay by C/S-1. During the operation, both video and photographs of Jay were taken.

6. On February 17, 2015, SA Nixon interviewed an inmate at the Peoria County Jail named [Redacted] during the interview [Redacted] was shown a portion of the above video and one of the photographs taken during the controlled drug purchase which depicted Jay. [Redacted] immediately recognized Jay as Demontae Bell. [Redacted] was asked "on a scale of one ten how confident are you the person in the photo is Bell?" [Redacted] replied, "ten."

7. Subsequent to the above interview, SA Nixon accessed Peoria County Jail's online record system justice.peoriacounty.org, booking number 1407736, and downloaded the booking photo of Demontae Bell, taken September 16, 2014. The photograph was printed on plain paper without Bell's name or any information to otherwise identify him. On February 23, 2015, SA Nixon showed the photograph to C/S-1 and asked if he/she recognized the individual. C/S-1 positively identified the individual in the photograph, saying "Yeah, that's Jay."

8. On February 23, 2015, SA Nixon requested a query of Demontae Bell's criminal history. Included in the query return was listed an arrest on December 5, 2002 for charges related to Delivery of Controlled Substances and a felony sentence disposition stating "3 YEARS."

9. On February 25, 2015, FBI and PMEG conducted a second controlled drug purchase from Demontae Bell A/K/A Jay involving the use of a concealed audio/video recording device. During the purchase Bell entered C/S-l's vehicle and engaged C/S-1 in conversation, including discussion about C/S-1's attempts to locate magazines for the AK-47 rifle. At the conclusion of the operation, C/S-1 advised SA Nixon Bell no longer had possession of the AK-47 rifle. Subsequent review of the video recording confirmed C/S-1's statement. In the recording Bell advises C/S-1that he sold the AK-47. Additionally on video, Bell advised C/S-1 he had a photo of the AK-47 and offered to send the photo to C/S-1 via text message. C/S-1received the photo. SA Nixon subsequently viewed the photo.

10. On April 7, 2015, SA Nixon interviewed Joel Weakley who provided a receipt for the original purchase of the stolen AK-47 indicating its serial number as

> 196000103 and that it had been purchased from Pekin Gun & Sporting Goods, Inc. in Pekin, Illinois. SA Nixon then made contact with Daniel Barth, manager of Pekin Gun & Sporting Goods, Inc. Barth advised the AK- 47 was a model 1960 and was imported from Poland by Century Arms, Inc.
>
> 11. Subsequent to the above interview, SA Nixon contacted Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent Frank Cecchinelli, a court certified expert in establishing firearms interstate nexus. SA Cecchinelli advised the gun had positively moved in interstate commerce based on the make, model, and importer information provided.
>
> ECF Doc. 72-1.

*2. The Alleged Omissions from the Nixon Affidavit*

Defendant argues that information was omitted from the affidavits, that the information was material to finding probable cause, and that the information was omitted by SA Nixon deliberately or with reckless disregard for the truth. Defendant asserts the following facts were intentionally omitted from the affidavit in support of the arrest warrant.[1]

> a) The "Reporting Officer Narrative" states that Joel Weakley, the victim of the burglary, reported that four firearms were missing from his residence and he believed Mr. Turner (C/S-1) stole them. Mr. Turner initially denied knowledge of the theft. After entering into a cooperation agreement with the government, Turner admitted that he and his brother broke into Weakley's house and stole a handgun, two big black guns, one gun that looked like an AK-47, and one camouflage sniper rifle. Mr. Turner claimed they "sold all of the guns" to the Defendant "very soon after the burglary" but made no mention of any other persons involved with the sale of the guns. Mr. Turner does not explain how he stole four guns, but sold five.
>
> b) On February 2, 2015, Turner met with Agent Nixon and informed him that at least three of the guns were sold to unnamed black males at 1630 New York. Turner observed six or seven males, cocaine and scales. Turner claimed the remaining two guns were taken to 1515 Monroe in Peoria. This would leave only one firearm stolen from Weakley unaccounted for and not in Defendant's possession.

Defendant first argues that the affidavit states four firearms were stolen from Weakley's residence, but Turner claimed he sold five guns. The discrepancy can be explained by looking to

---

[1] Defendant argues that all three affidavits contained the same omissions. The assertions in the arrest warrant affidavit that are relevant to Defendant's motion are common to the assertions in the later search warrants. For the sake of simplicity, the Court refers only to the arrest warrant affidavit unless otherwise indicated.

7

the paragraph 3 of Agent Nixon's affidavit, which states that "[a]mong the items stolen included one Glock pistol, two AR-15 style rifles, one Polish AK-47 style rifle, and one *air rifle* with a scope." ECF Doc. 72-1, ¶ 3 (emphasis added). Thus, five items were stolen from Weakley's residence, but one of them was a pellet gun. The affidavit does not omit this fact. Regardless, the alleged discrepancy about the number of firearms, without more, does not require a *Franks* hearing. See *United States v. Smith*, 576 F.3d 762, 765 (7th Cir. 2009); *United States v. Norris*, 640 F.3d 295, 302 (7th Cir. 2011).

Second, Defendant asserts that the affidavit omits or misstates the number of firearms C/S-1 allegedly sold to Defendant. The report Defendant references states that C/S-1 "made a deal with Jay [Demontae Bell] and his cousin/brother to sell all five of the guns to them for $500 cash, approximately 10 grams of powder cocaine, and a couple grams of crack" and "both the long black guns (Agent note: AR-15s) and the loaded pistol were kept at this [1630 New York] address." ECF Doc. 72-8. The AK-47 and the "sniper rifle" i.e., the pellet gun, were taken with Bell and C/S-1 to 1515 Monroe. Defendant argues that "this would leave only 1 firearm stolen from Mr. Weakley unaccounted for and not in Defendant's possession." It is unclear what information Defendant claims was omitted from the affidavit, or how the alleged omission was material to the probable cause determination. In other words, Defendant does not explain how possession of one firearm instead of two would alter the probable cause analysis. See *Smith*, 576 F.3d at 765; *Norris*, 640 F.3d at 302.

> c) There exists no evidence to link the Defendant to either 1630 New York or 1515 Monroe in Peoria. Surveillance was conducted outside of 1515 Monroe for only one hour. Defendant was not seen. A drive-by was performed past 1630 New York and Defendant was not seen. The FBI did not associate either of these addresses with the Defendant when preparing to arrest him.

>d) On February 3, 2015, Mr. Turner was shown a photo lineup of persons associated with the residence located at 1630 New York, but Mr. Turner claimed not to know any of the persons depicted.
>
>e) On February 11, 2015, Mr. Turner drove with Agent Nixon past 1630 New York in Peoria, again stating that this was the residence in which at least 3 guns were sold. Mr. Turner and Agent Nixon also drove past 1515 Monroe, during which time Mr. Turner described this residence as a place where Defendant would buy crack. There was no mention of Defendant living at this address. In previous meetings, Mr. Turner stated Defendant lived in the Taft Homes or on Green Street in Peoria.

Defendant's next three arguments are directed to the affidavit's omission of two residences identified by C/S-1 as the location where the guns were allegedly sold to Defendant (1630 New York) and where Defendant allegedly took two of the guns (1515 Monroe). He claims that no evidence existed that associated Bell with the two residences. Defendant also questions C/S-1's credibility by pointing out that C/S-1 was not able to identify any of the people associated with the 1630 New York residence in a photo lineup, and that C/S-1 described the Monroe residence as the place where Defendant buys drugs, not where he lives. The affidavit in support of the arrest warrant does not mention either address.

Defendant cannot show the two residences were omitted from the warrant affidavit intentionally or with reckless disregard for the truth. To the contrary, if Defendant's claim that "the FBI did not associate either of these addresses with Defendant when preparing to arrest him," is taken as true, Agent Nixon would have opened the door to a *Franks* hearing for including a false statement linking the residences to Defendant in the affidavit. In other words, an affiant cannot intentionally omit a fact he or she did not have knowledge of. See *Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009).

Defendant also argues that the affidavit omits that C/S-1 was a shown a photo lineup of six individuals associated with the 1630 New York residence and claimed not to recognize any of

9

the persons depicted. However, the photographs of Bell and his cousin were not included in the lineup. See ECF Doc. 72-12. Moreover, there is no indication that the six individuals "associated with the 1630 New York residence" were the same individuals that were present during the alleged firearms sale. Police are not required to "provide every detail of an investigation, []or describe every wrong turn or dead end they pursued." *McMurtrey*, 704 F.3d at 513.

> f) On February 13, 2015, an alleged controlled buy was arranged between the Defendant, Mr. Turner and Sara Grandy, Mr. Turner's girlfriend. This meeting was secretly recorded. The United States prepared a transcript of the recording. During this meeting Mr. Turner was vague, asking if Defendant remembered "those things" and if the Defendant "still got that one?" To this questioning, the Defendant answered, "No." The conversation continues where the Defendant states "you're talking about the one I got." This conversation made Agent Nixon reasonably aware that 3 of the 4 firearms were likely sold to unnamed persons at 1630 New York, not the Defendant. This information was omitted from Agent Nixon's Affidavit.
>
> g) In addition, Mr. Turner and Ms. Grady appear to be covering up some information, as set forth on pages 9 and 10 (Bates 1157 and 1158). In part the parties were recorded making the following statement after Defendant exited the vehicle: [See ECF Doc. 72-14]

First, Defendant argues that C/S-1's vague references and Bell's statement regarding "the one I got" should have led Agent Nixon to believe that Bell purchased only one firearm and that the rest were sold directly to others at the 1630 New York residence. See ECF Doc. 72-14. However, whether or not Defendant was *still* in possession of all of the stolen firearms on February 13, 2015, is irrelevant to the issue of whether there was probable cause to believe that Defendant *had possessed* one or more firearms. See *Norris*, 640 F.3d at 302. Agent Nixon could reasonably believe that Bell purchased all the firearms in order to resell them. Moreover, the affidavit states that C/S-1 and Bell discussed one firearm in particular, and also discloses that Defendant was no longer in possession of the firearm. In sum, Defendant has not shown how the

allegation amounts to a knowing or reckless omission, or how the omission impacted the magistrate's probable cause determination.

Defendant also points to the transcripts of the recordings to argue that C/S-1 and his girlfriend were trying to cover up information. The transcript indicates Turner grabbed Ms. Gandy's elbow and said "Just stop talkin' about that right now." ECF Doc. 72-14. Yet Defendant does not explain what Turner is allegedly "covering up," how it relates to Nixon's affidavit, or how it affects the existence of probable cause for Bell's arrest. Police are not required to "provide every detail of an investigation." *McMurtrey*, 704 F.3d at 513. Without additional information indicating the significance of C/S-1's alleged "cover up," Defendant cannot show that Agent Nixon deliberately omitted information or that the alleged omission was material to the magistrate's probable cause determination.

> h) On February 17, 2015, Agent Nixon interviewed an inmate at the Peoria County jail. Until the time of this interview, Agent Nixon was unaware of this Defendant's name, as Mr. Turner claimed to be unaware of Defendant's name, referring to him as "Jay." In reports prepared prior to this meeting, Defendant was referred to as "Jay." The affidavits all refer to Defendant as "Jay." However, at the February 17, 2015 meeting, an unknown inmate viewed images taken on February 13, 2015 during a controlled buy between Mr. Turner and Defendant. The inmate refers to Defendant as "Demontae Bell." However, the inmate contradicts Mr. Turner and states the Defendant goes by the street name of "Te Te" or "Tay Tay."

Here, Defendant claims that the affidavit omitted the fact that the person who C/S-1 knew as "Jay" was identified by another as Demontae Bell, or "Tay Tay." ECF Doc. 72-15. Yet Defendant overlooks the fact that the inmate positively identified the photograph of the suspect as Demontae Bell. "Jay" is similar to "Tay," and Defendant does not explain how the discrepancy between "Tay Tay," rather than "Jay," is material. See *Souffront*, 338 F.3d at 821 (a technical contradiction does not reveal a disregard of the truth); *United States v. Maro,* 272 F.3d 817, 822 (7th Cir. 2001).

11

>i) On February 25, 2015, a second alleged controlled buy was arranged between the Defendant, Mr. Turner and Sara Grandy, Mr. Turner's girlfriend. This meeting was also secretly recorded. The United States prepared a transcript of the recording. See Exhibit "P".  Agent Nixon debriefed Mr. Turner after the alleged controlled buy. Mr. Turner told Agent Nixon that the Defendant claimed he did not have the <u>firearm</u> (singular), that the resident of 1630 New York had the other firearms and that Defendant believed that one of the firearms sold was a pellet gun. See Exhibit "Q". Mr. Weakley confirmed for Agent Nixon that one of the guns was a pellet gun. None of this information was contained in the Affidavits.

Here, Defendant simply rehashes the same argument made in paragraph f. The alleged omissions are the result of Defendant misstating the information contained in the affidavit. Paragraph 9 of the affidavit states that a second controlled buy was conducted and recorded, the C/S-1 and Bell discussed attempts to locate magazines for the AK-47 rifle, and Bell advised C/S-1 that he sold the rifle. ECF Doc. 72-1, at ¶ 9. Defendant fails to make a sufficient showing for a *Franks* hearing because he does not allege that a false statement was included in the affidavit or that information was omitted. See *McMurtrey*, 704 F.3d at 509 ("The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations.").

>j) On April 21, 2016, Mr. Turner and Ms. Grandy reported a theft at their home, located at 1504 Hamilton in Pekin. See Exhibit "R". Scott and Melissa Weatherington, Mr. Turner's neighbors, also reported a theft, including a stolen firearm. See Exhibit "S". Mr. Weatherington believed Mr. Turner may have committed the theft. See Exhibit "T". Pekin Police checked LEADS, learning Mr. Turner and Ms. Grandy pawned property similar to that which was stolen from Mr. Weatherington. See Exhibit "U". Mr. Turner was interviewed and confronted with these facts. Mr. Turner lied and claimed other persons likely committed the thefts. Ultimately, Mr. Turner confessed to the theft, filing a false report and selling the stolen firearm. See Exhibit "V".
>
>k) The FBI cut ties with Mr. Turner as an informant and indicated as much in a related Affidavit, yet the extent of Mr. Turner's actions was not disclosed. See Exhibit "W". The government advised this Court that Mr. Turner "had recently began using drugs again and had been involved in commission of several crimes." The government downplayed Mr. Turner making another false police report and yet again wrongfully accusing others of criminal activity.

Defendant makes two related arguments regarding the confidential source. First, Defendant claims that C/S-1 was not a credible source because he stole property from a neighbor's residence and then lied about it. Next, he argues that the affidavits in support of the warrants omitted the extent of C/S-1's subsequent criminality. Recall that the arrest warrant was issued on April 8, 2015, and executed the next day. The first search warrant was issued on April 17 and executed April 30, 2015; the second was issued on October 20 and executed on October 22, 2015. Defendant cannot claim that the April 8 arrest warrant affidavit or April 17 search warrant affidavit omitted information—C/S-1's theft on April 21, 2015—that had not yet occurred.

Although the first search warrant was issued before C/S-1's arrest, it was executed after Agent Nixon knew that C/S-1 had been arrested for the same conduct that led to his cooperation against Bell. Defendant's argument implies that Agent Nixon had a duty to return to the judge after the search warrant had issued in order to disclose C/S-1's arrest. Information learned after issuance but before execution of a warrant can sometimes invalidate the warrant. These issues generally arise when a warrant is ambiguous, i.e., "where the place to be searched contains multiple living units and the warrant fails to identify with precision which unit is to be searched." *Cooper v. Dailey*, 2010 WL 1415986, at *4 (N.D. Ill. 2010); *Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009). However, unfavorable information about a confidential informant's credibility that comes to light after a warrant has issued falls outside the scope of a *Franks* motion. *Guzman*, 565 F.3d at 396 ("Information that emerges after the warrant is issued has no bearing on this analysis.") *Jones v. City of Chicago*, 2016 WL 1730647, at *4 (N.D. Ill. 2016); *U.S. v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014). Because probable cause determinations are not viewed with hindsight, "the validity of the warrant is assessed on the basis of the

13

'information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.'" *Guzman*, 565 F.3d at 396.

Impeaching information regarding a confidential source that is obtained after a warrant has issued may be so significant that it alters the probable cause determination. However, that is not the case here. Significantly, the first search warrant made no reference to C/S-1's reliability, and it put the issuing judge on notice that C/S-1 stole the weapons from his neighbor and he had been arrested on charges related to manufacture of methamphetamine. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238–39 (U.S. 1983). Here, Agent Nixon did not rely solely on C/S-1's information, but collaborated that information by having another source confirm Bell's identity, and by recording two controlled buys where Bell discusses the firearm and sends a picture of it to C/S-1. Together, these statements provided the issuing judge with a substantial basis for concluding that probable cause existed.

Defendant also points out that the Government obtained a search warrant for C/S-1's phone on April 30, 2015. Officer Sinks' affidavit in support of that warrant disclosed that C/S-1 was arrested on April 24, 2015, "by the Pekin Police Department on charges related to possession of stolen property. SA Nixon subsequently interviewed C/S-1, at which time C/S-1 advised he/she had recently began using drugs again and had been involved in the commission of several crimes. Due to this admission, C/S-1 is no longer an active FBI Confidential Human Source." ECF Doc. 23, ¶ 11. The warrant, which largely tracked the language used in Bell's prior arrest and search warrants, was granted by Magistrate Judge Hawley. The fact that the issuing judge concluded that probable cause existed despite C/S-1's subsequent criminality is fatal to Defendant's argument that the alleged omission—which developed after the first search warrant

was issued—was material to the probable cause determination. Moreover, when the Government sought a search warrant for C/S-1's phone six days after they became aware of his arrest, they included that information in the affidavit. This suggests that C/S-1's subsequent criminality was not intentionally or recklessly omitted in order to deceive the issuing judge.

While Defendant is correct that the October search warrant omits information regarding C/S-1's subsequent criminal conduct, the application for the arrest warrant was not based solely off of C/S-1's information, but also included collaborating information obtained during the two controlled buys, collaborating information regarding the AK-47 from Weakley, and independent identification of Defendant from an inmate at Peoria County Jail. Viewed together, this information supports a determination of probable cause for Bell's arrest.

> l) On March 5, 2015, a month before Agent Nixon ever sought any warrants, Mr. Turner told him that Marquis Heywood was likely the black male Mr. Turner had sold at least 3 of the guns to at 1630 New York. See Exhibit "X". On the same day as Defendant's arrest, a search warrant was executed on 1630 New York revealing nothing illegal. See Exhibit "Y".

Finally, Defendant argues that the arrest affidavit omits that C/S-1 identified Haywood as one of the individuals present when the guns were sold at the 1630 New York residence, and that a search warrant for the residence was executed but did not reveal anything illegal. Again, Defendant misstates the information contained in the report. The report states that C/S-1 said "I'm about 90% sure that's the dude from the New York house." No reference is made to C/S-1 selling some of the firearms to Heywood. Moreover, whether Defendant possessed one firearm or multiple firearms is immaterial to the probable cause determination, because possession of *a firearm* by a felon is a crime. See *United States v. Norris*, 640 F.3d 295, 302 (7th Cir. 2011) (finding that the exact quantity of drugs was immaterial because possession of even a small amount of cocaine is a crime).

In conclusion, Defendant has failed to make a "substantial preliminary showing" that information was intentionally or recklessly omitted from the warrant affidavits or that the alleged omissions were material to the probable cause determination. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). As such, he is not entitled to a *Franks* hearing.

## B. DEFENDANT'S MOTION TO QUASH ARREST

Defendant previously moved to quash the arrest warrant and suppress evidence. Defendant's motion argues that: (1) the affidavit submitted in support of the warrant application relied on a confidential source who did not testify before the issuing judge and whose reliability was not established; (2) the recording and transcripts were not provided to the issuing judge; (3) the affidavit does not state whether the confidential source or the theft victim confirmed that the firearm depicted in the photograph was the same firearm that was stolen and later sold to the Defendant; and (4) the affidavit lacks information regarding the confidential source's reliability or how he was able to identify the Defendant. ECF Doc. 68.

The Court's prior Opinion denying Defendant's motion to suppress provided an extensive analysis regarding the existence of probable cause in relation to the search warrants for Bell's cell phone. See ECF Doc. 71, at 12-16. That Opinion stated:

> Here, the issuing judge had a substantial basis for determining the existence of probable cause, and omitting the offending paragraph about the officer opening the phone does not alter that conclusion. Defendant argues that the affidavit in support of the warrant relied on a confidential source who did not testify in front of the issuing judge, and who cooperated with law enforcement as part of a proffer agreement for drug charges. True, but the veracity of an informant is only one factor among many that Courts consider when making a probable cause determination. See *Gates*, 462 U.S. at 238. And while veracity, reliability, and basis of knowledge are highly relevant, those considerations should not "be understood as entirely separate and independent requirements to be rigidly drawn in every case." *Id.* at 230. Moreover, "[t]he reliability or veracity of an informant in a particular case can also be shown by corroboration of the information he provides through independent police investigation." *United States v. Mitten*, 592 F.3d 767, 774 (7th Cir. 2010). The fact that the confidential source was

16

> "motivated by a desire to lessen the consequences [he] would likely suffer for [his] own crimes . . . does not make the information [he] provide[d] inherently unreliable." *Id.* (quoting *United States v. Olson*, 408 F.3d 366, 371 (7th Cir. 2005)).
>
> Here, the confidential source was implicated by the victim of the firearm burglary, who the victim believed had knowledge of his gun collection and sold guns. When law enforcement interviewed C/S-1, he admitted he sold the guns to a Peoria drug dealer with the alias "Jay." A separate informant confirmed that "Jay" was Demontae Bell. A search of Bell's criminal history revealed that he had a prior felony conviction for delivery of a controlled substance. The two controlled purchases between Bell and C/S-1 were recorded. The affidavit summarizes (accurately) the conversations between Bell and C/S-1, including admissions by Bell that he sold the AK-47. Significantly, the affidavit states, and the transcript supports, the fact that Bell used his cell phone to send C/S-1 a picture of the firearm, and that SA Nixon viewed the picture on C/S-1's phone shortly after it was sent.
> From these facts, the affidavit submitted in support of the warrant application provided detailed, collaborated information from which the issuing judge reasonably concluded there was a fair probability that contraband or evidence of a crime would be found on Defendant's cell phone. *Gates*, 462 U.S. at 238.

ECF Doc. 71, at 14-15.

Defendant's instant motion simply rehashes the arguments in support of his prior motion attacking the search warrants. The reasoning behind the denial of Defendant's prior motion is equally applicable to the motion to quash—the affidavit submitted in support of the arrest warrant application provided detailed, collaborated information from which the issuing judge reasonably concluded there was probable cause to believe that Defendant illegally possessed a firearm. See *Gates*, 462 U.S. at 238. Accordingly, Defendant's motion to quash is denied.

## CONCLUSION

For the reasons stated above, Defendant's Motion [68] to Quash and Motion for *Franks* Hearing [72] are DENIED.

Signed on this 4th day of November, 2016.

s/ James E. Shadid  
James E. Shadid  
Chief United States District Judge